UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

SOUTHERN DIVSION

| | |
|---|---|
| CAROL STUBENRAUCH,<br><br>            Plaintiff,<br><br><br>    vs.<br><br><br>CITIZENS FINANCIAL GROUP, INC.,<br><br>                 Defendant. | 4:16-CV-12948-TGB<br><br><br>HON. TERRENCE G. BERG |

## ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR SUMMARY JUDGMENT (DKT. 16)

Carol Stubenrauch ("Plaintiff") was a bank employee and manager for Citizens Financial Group, Inc. ("Defendant") and its predecessor banks from June 1998 until July 2015. She believes she was unlawfully terminated due to age, gender and disability discrimination, as well as in retaliation for her complaints about such discrimination. Plaintiff's Complaint raises claims under Title VII, Michigan's Elliott-Larsen Civil Rights Act ("ELCRA"); the Age Discrimination in Employment Act

("ADEA"); Michigan's Persons with Disabilities Civil Rights Act ("PWD-CRA"); and the American's with Disabilities Act ("ADA") (Dkt. 1).

Defendant filed a motion for summary judgment (Dkt. 16), arguing that Plaintiff cannot demonstrate a genuine issue of material fact that her gender and alleged disability were motivating or significant factors in her termination, or that her age or alleged protected activity were the "but for" causes of her termination.  Plaintiff responded (Dkt. 23), and Defendant replied (Dkt. 24).  The Court heard oral argument on April 4, 2018.[1]  For the reasons set forth below, Defendant's motion for summary judgment is **GRANTED IN PART** and **DENIED IN PART**.

## MATERIAL FACTS

As a preliminary matter, the Court notes that Plaintiff did not follow the Court's practice guidelines for responding to a motion for summary judgment that are available on the Court's website. These practice guidelines provide as follows:

> A Rule 56 motion must begin with a "Statement of Material Facts." Such a Statement is to be included as the first section of the Rule 56 Motion. The Statement must consist of separately numbered

---

[1] The parties also submitted "supplemental" briefs that resubmitted previously illegible exhibits (Dkts. 26-28).

paragraphs briefly describing the material facts underlying the motion, sufficient to support judgment. Proffered facts must be supported with citations to the pleadings, interrogatories, admissions, depositions, affidavits, or documentary exhibits. Citations should contain page and line references, as appropriate.... The Statement of Material Facts counts against the page limit for the brief. No separate narrative facts section shall be permitted.

The response to a Rule 56 Motion must begin with a "Counter-statement of Material Facts" stating which facts are admitted and which are contested. The paragraph numbering must correspond to moving party's Statement of Material Facts. If any of the moving party's proffered facts are contested, the non-moving party must explain the basis for the factual disagreement, referencing and citing record evidence. Any proffered fact in the movant's Statement of Material Facts that is not specifically contested will, for the purpose of the motion, be deemed admitted. In similar form, the counter-statement may also include additional facts, disputed or undisputed, that require a denial of the motion.

While Defendant's "Statement of Relevant Facts" was organized in separately numbered paragraphs, Plaintiff's response omitted the "Counter-statement." Without a counter-statement, Plaintiff failed to identify clearly which material facts are subject to dispute. The Court nonetheless conducted a thorough review of parties' briefs, oral arguments, and exhibits and gleaned the following facts, which are viewed in a light most favorable to Plaintiff as the non-moving party.

Plaintiff, who was 55 at the time of her termination in 2015, began working for First Federal of Michigan on June 29, 1998 as an in-store

banker. The bank changed ownership multiple times during her employment, but for the majority of her employment, she worked for Charter One. Defendant Citizens Financial Group acquired Charter One in 2004. By then, Plaintiff had already been promoted to a branch manager, the highest ranking employee in an individual branch. During her employment, Plaintiff worked at several branches. In 2010, she became the branch manager at the "12 Mile and Dequindre" branch. As branch manager, Plaintiff was responsible for managing the branch, supervising the employees, promoting sales, and ensuring compliance with all banking policies to keep audit violations to a minimum.

*i) Plaintiff's Prior Performance History*

Defendant maintains that Plaintiff was often rude, abrasive and unprofessional in her dealings with her subordinate employees. Plaintiff's employment records evidence mixed reviews during her time as a branch manager. Some records are very positive, while others show that she was a difficult boss who had problems with her subordinate employees in the bank branch.

In April 16, 2009, an unidentified "colleague" in Plaintiff's branch complained to Employee Relations that Plaintiff provided no teamwork,

exhibited unprofessional behavior, was intimidating and rude, and did not assist employees with irate customers, often reprimanding colleagues in front of others (Dkt. 16, Ex. 9). In response to this complaint, Cathy Fisher, the regional manager at the time, prepared a Performance Development Plan ("PDP") to address these concerns (Dkt. 16, Ex. 9).

A few months later, on November 19, 2010, Fisher placed Plaintiff on a Performance Improvement Plan ("PIP") due to poor customer satisfaction scores (Dkt. 16, Ex. 10). This PIP was focused on Plaintiff's branch's interactions with customers in the bank. It does not appear to be focused on Plaintiff's management of branch employees. In this PIP, Plaintiff was warned that if her branch did not improve in its interactions with customers, then Plaintiff could be subjected to further discipline, up to and including termination.

Plaintiff received a "3" or "fully achieved objectives" rating on her annual 2011 performance review (Dkt. 16, Ex. 12). The regional manager's evaluation of Plaintiff's performance is set forth in the comments. Fisher noted on Plaintiff's 2011 review that "she should be conscious of how her frustrations can negatively impact others and her image as a leader" (*Id.*).

On July 2, 2012, another colleague complained to Employee Relations about the manner in which Plaintiff treated her. The colleague requested a transfer away from the branch saying that Plaintiff had thrown a document at her, chastised her about her sales results, and showed no compassion toward another colleague in pain. Fisher scheduled an all-employee meeting at the branch to address these concerns (Dkt. 16, Ex. 13). The records do not reflect the results of this meeting.

On or about January 1, 2014, Susan Smigiel replaced Fisher as the regional manager for the North Region (Dkt. 16, Ex. 7, Smigiel Dep. at 37). Defendant contends that Plaintiff's performance declined substantially in 2014. Plaintiff admitted in her 2014 annual review that she "had the worst year in performance for the 16 years [she'd] been" at the bank. Due to her unsatisfactory performance, she received a "2" or "Development Required" rating (Dkt. 16, Ex. 14, 2014 Review).

## ii) *Plaintiff's Request to Transfer*

In mid-2014, Christopher Foster, a newly hired 32-year-old employee who had prior experience as a branch manager at Chase Bank, was offered the vacant branch manager position at the Rochester/Wa-

bash branch in the North region. Foster had a bachelor's degree and demonstrable excellent performance at Chase (Dkt. 16, Ex. 15, Foster at Dep. 7-9, 17, 22; Ex. 7, Smigiel Dep. at 80). Upon learning of Foster's selection as the branch manager for the Rochester/Wabash branch, Plaintiff became upset. She had worked at that branch previously and believed she should have been given the opportunity to transfer over Mr. Foster, as the branch was closer to her home and she had more years of experience at the bank than he had (Dkt. 16, Ex. 2, Plaintiff Dep. at 24-26, 30).

The decision to move Foster into this position was made by Smigiel, Keith Mazur (an acting regional manager at the time), and "the business line as a whole" (Dkt. 16, Ex. 7, Smigiel Dep. at 44; Ex. 16, Case #526557-0). Smigiel testified that she recruited Foster to Citizens and selected him for the Rochester/Wabash branch because he was a top performer at his prior job, and he was successful and very productive in his training (Dkt. 16, Ex. 7, Smigiel Dep. at 79-80).

Plaintiff testified that she spoke to Smigiel and contacted Employee Relations to voice her complaints (Dkt. 16, Ex. 2, Plaintiff Dep. at 29-33). At her deposition, Plaintiff testified that she told Employee Relations she

believed she was being discriminated against because of her age, however documents created by Employee Relations contemporaneous with her complaint do not evidence that she mentioned age discrimination. Rather, they state that Plaintiff:

> [E]xpressed dissatisfaction that she was not transferred to a Branch closer to her home. [Plaintiff] feels she is the most qualified candidate as she has greater length of service than the [branch manager] who is currently in the Branch.

(Dkt. 16, Ex. 16, Case #526557-0).

These records also reflect that Plaintiff stated that she "hasn't performed her best due to a medical condition," but that Plaintiff was not requesting any leave of absence (*Id.*). Likewise, Plaintiff's 2014 annual evaluation mentions a desire to transfer, but makes no mention of any complaint of alleged age discrimination (Dkt. 16, Ex. 14, 2014 Review). Furthermore, Smigiel testified that she did not recall Plaintiff mentioning age discrimination to Employee Relations in conjunction with the denial of Plaintiff's requested transfer (Dkt. 16, Ex. 7, Smigiel Dep. at 52-54). Plaintiff admitted during her deposition that the Rochester/Wabash position would have been a lateral transfer, and not a promotional opportunity, for her (Dkt. 16, Ex. 2, Plaintiff Dep. at 25, 31- 32).

*iii)  Events Leading to Plaintiff's Termination*

On May 14, 2015, bank employee "Jessica" complained to Employee Relations that Plaintiff was harassing her and treating her differently because she had just returned to work from having a baby. According to company protocol, a case number was assigned to the call and Employee Relations Consultant Jenifer Moskalenko was assigned to investigate. As a result of the investigation, Plaintiff was issued a Verbal Warning on May 28, 2015.  At that time, Smigiel instructed Plaintiff to be careful of how her comments could be perceived and to stop engaging in discussions with employees regarding other employees' work performance (Dkt. 16, Ex. 17, Case #553169-0).

On June 25, 2015, "AJ" (sometimes referred to in the record as "Ajay") complained that Plaintiff was creating a hostile work environment. A new case number was assigned and Moskalenko was again assigned to investigate this call (Dkt. 16, Ex. 18, Case #557018-0). Employees in the branch were interviewed for their feedback and witness statements were collected from each of them on June 26, July 1, July 2, July 3, and July 11, 2015.  Several employees said they were considering quit-

ting if Plaintiff's behavior continued. Defendant contends that the investigation revealed the following feedback regarding Plaintiff: (i) she slammed things; (ii) she had verbal outbursts and cursed; (iii) she threw things; (iv) she threatened jobs; (v) she talked about other employee's performance in front of others; and (vi) she made improper timesheet adjustments (Dkt. 16, Ex. 18, Case #557018-0).

Marla Zwiesele, one of Plaintiff's employees at the 12 mile/Dequindre branch, testified that Smigiel approached her in this same timeframe and asked her for a statement about Plaintiff (Dkt. 23, Ex. 9, Zwiesele Dep. at 7). Before Smigiel had made this request, Zwiesele had never complained about Plaintiff (*Id.* at 8). Zwiesele testified that she had an amiable working relationship with Plaintiff (*Id.* at 22). Zwiesele testified that at the bank, profanity was used often, by many employees (*Id.* at 25), including all the "curse" words, even at times when customers were present (*Id.* at 27). Zwiesele testified that she has heard Plaintiff's replacement, Chris Starling, use profanity (*Id.* at 26). Former branch manager Jill Donahue also confirmed that profanity was common at the 12 mile/Dequindre branch (Dkt. 23, Exh. 11, Donahue Dep. at 26). Zwiesele further testified that one of the complainants against Plaintiff

– "Jessica" – did not like Plaintiff (Dkt. 23, Exh. 9, Zwiesele Dep. at 29), and that Jessica had in fact deserved a reprimand from Plaintiff because Jessica exceeded her allotted time for breastfeeding (*Id*. at 30). Zwiesele also described the conduct of "AJ," the other person complaining about Plaintiff, as a "subpar" performer, as someone who "took lots of naps" on the job, and who had a poor manner of dealing with customers (*Id*. at 16-18). Zwiesele testified that Plaintiff was not overly harsh with Jessica (*Id*. at 30-31), AJ (*Id*. at 31) or with Zwiesele herself (*Id*. at 31). She also testified that she could not recall Plaintiff ever using profanity toward any employee specifically (*Id*. at 38 and 40).

On July 16, 2015, Moskalenko informed Smigiel that Plaintiff's conduct was severe enough to warrant immediate termination. Smigiel contacted Karen Minghine, the retail director, for concurrence, which Minghine gave (Dkt. 16, Ex. 18, Case #557018-0). On July 30, 2015, Smigiel met with Plaintiff to discuss the complaints against her. Moskalenko, who works in Rhode Island, participated by phone. When presented with the evidence collected against her, Plaintiff denied some of the allegations but admitted many of them. At the end of the meeting, Plaintiff was informed her employment was being terminated (Dkt. 16, Ex. 18, Case

#557018-0).  Defendant's stated reason for terminating Plaintiff's employment was her having created a hostile work environment in violation of the Harassment Free Workplace policy (Dkt. 16, Ex. 18, Case #557018-0; Ex. 1, Moskalenko Dec, ¶23).

Defendant denies that Plaintiff's gender, age, disability or alleged protected activity played any role in the discharge decision (Dkt. 16, Ex. 1, Moskalenko Dec, ¶24; Ex. 21, Smigiel Dec, ¶7).  Plaintiff denied some of the conduct attributed to her by her employees, but she admitted that she yelled, slammed a drawer shut, threatened a banker with loss of his employment, and spoke to her colleagues in a "direct," "no fluff" manner (Dkt. 16, Ex. 18, Case #557018-0).

Plaintiff was replaced by Chris Starling, who at that time in 2015 was age 55. (Dkt. 16, Ex. 19, Defendant's Responses to Plaintiff's Interrogatories).  Plaintiff contends that some employees were treated more favorably than she was and were not disciplined for violating Company policies (Dkt. 16, Ex. 2, Plaintiff Dep. at 34-46, 114-120, 299-300).  Defendant points out that, since Smigiel became the regional manager of the North region, Defendant disciplined or terminated eight branch man-

agers in the North region including Plaintiff (Dkt. 16, Ex. 22, List of Terminations).  But that the total roster of branch managers still employed within the North region as of July 31, 2015 – the day after Plaintiff's discharge – belied any inference of discrimination: 54% were female and 54% percent were age 40 or older (Dkt. 16, Ex. 1, Moskalenko Dec, ¶28-29).

Plaintiff views the termination data differently, interpreting it as suggestive of discrimination.  According to Plaintiff, there were 17 branch managers who departed under Smigiel during the relevant time period (Dkt. 23, Ex. 12, Chart of Terminations). Of the 17 departing branch managers, 7 were male, but 10 were female.  However, Plaintiff points out that the males who left the bank under Smigiel did so mostly voluntarily, but the females were almost all involuntarily fired by Smigiel (*Id.*). Of the 7 departures of male branch managers, only 1 was involuntarily terminated by Smigiel. Of the 10 departures of female branch managers, 6 were fired involuntarily by Smigiel.  Plaintiff contends that this data creates an inference of gender discrimination.  Plaintiff also contends that the data indicates that terminated branch managers tend to be older than those retained.

# ANALYSIS

## A.  *The Standard for Summary Judgment*

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. Proc. 56(a).  A fact is material only if it might affect the outcome of the case under the governing law.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  On a motion for summary judgment, the Court must view the evidence, and any reasonable inferences drawn from the evidence, in the light most favorable to the non-moving party.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citations omitted); *Redding v. St. Edward*, 241 F.3d 530, 531 (6th Cir. 2001).

The moving party has the initial burden of demonstrating an absence of a genuine issue of material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  If the moving party carries this burden, the party opposing the motion "must come forward with specific facts showing that there is a genuine issue for trial."  *Matsushita*, 475 U.S. at 587.  The Court must determine whether the evidence presents a sufficient factual disagreement to require submission of the challenged claims to a jury or

whether the moving party must prevail as a matter of law. *See Anderson*, 477 U.S. at 252 ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff").

Moreover, the trial court is not required to "search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir. 1989). Rather, the "nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact." *In re Morris*, 260 F.3d 654, 655 (6th Cir. 2001).

## B. *Gender Discrimination*

Title VII's anti-discrimination provision makes it "an unlawful employment practice for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1).[2] Intentional discrimination

_____

[2] Plaintiff also brings a gender discrimination claim under Michigan's ELCRA. Section 202 of ELCRA provides that "[a]n employer shall not ... [f]ail or refuse to hire or recruit, discharge, or otherwise discriminate against an individual with respect to

claims under Title VII can be proven by direct or circumstantial evidence. *DiCarlo v. Potter*, 358 F.3d 408, 414 (6th Cir. 2004). "Direct evidence is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Jacklyn v. Schering–Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 926 (6th Cir.1999). Circumstantial evidence, on the other hand, is proof that does not on its face establish discriminatory animus, but does allow a factfinder to draw a reasonable inference that discrimination occurred. *Kline v. Tenn. Valley Auth.*, 128 F.3d 337, 348 (6th Cir. 1997). Plaintiff does not rely on direct evidence of discrimination, but rather presents circumstantial evidence.

Because Plaintiff relies on circumstantial evidence, the analysis of her discrimination claim is guided by the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 818 (6th Cir. 2011); *see*

---

employment, compensation, or a term, condition, or privilege of employment, because of religion, race, color, national origin, age, sex, height, weight, or marital status." Mich. Comp. Laws § 37.2202(1)(a). Primarily, "[c]ases brought pursuant to the ELCRA are analyzed under the same evidentiary framework used in Title VII cases." *In re Rodriguez*, *653 487 F.3d 1001, 1007 (6th Cir. 2007) (citing *Humenny v. Genex Corp.*, 390 F.3d 901, 906 (6th Cir. 2004)); *see Sniecinski v. Blue Cross & Blue Shield of Mich.*, 469 Mich. 124, 666 N.W.2d 186, 193 (2003).

*also Lytle v. Malady*, 458 Mich. 153, 171-75, 173 n. 19 (1998); *Hazel v. Ford Motor Co.*, 464 Mich. 456, 462-64 (2001).

Under the *McDonnell-Douglas* framework, Plaintiff must first establish a prima facie case of discrimination by a preponderance of the evidence. *See Lytle*, 458 Mich. at 172. If Plaintiff does so, a presumption of discrimination arises and the burden then shifts to Defendant to assert a legitimate, non-discriminatory reason for firing Plaintiff. *Id.* at 173. Plaintiff may then respond with evidence that Defendant's proffered reason is a mere pretext for discrimination. *Id.* Plaintiff can rely on the same evidence to prove both pretext and discrimination as long as the evidence would enable a reasonable factfinder to infer that the employer's decision had a discriminatory basis. *See id.* at 178.

In large part, Plaintiff's opposition to Defendant's motion for summary judgement rests on her contention that female branch managers were disciplined more harshly than male branch managers. For such a claim, "[t]he plaintiff need not demonstrate an exact correlation with the employee receiving more favorable treatment in order for the two to be considered 'similarly-situated.'" *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998). Rather, Plaintiff and the employee

17

with whom the plaintiff seeks to compare herself must be similar in "all relevant aspects." *Ercegovich*, 154 F.3d at 352. "Proof of discriminatory motive is critical, although it can in some situations be inferred from the mere fact of differences in treatment." *Hartsel v. Keys*, 87 F.3d 795, 800 (6th Cir. 1996) (quoting *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 355 n. 15, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977)).

### i. Prima facie case

To establish a prima facie case of gender discrimination under Title VII, Plaintiff must show that: 1) she is a member of a protected class; 2) she was qualified for the job and performed it satisfactorily; 3) despite her qualifications and performance, she suffered an adverse employment action; and 4) she was replaced by a person outside the protected class or was treated less favorably than a similarly situated individual outside of her protected class. *See Laster v. City of Kalamazoo*, 746 F.3d 714, 727 (6th Cir. 2014). Further, a plaintiff's burden at the prima facie stage is "not onerous" and "poses a burden easily met." *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 660 (6th Cir. 2000) (internal quotation omitted).

I find that Plaintiff has established a prima facie case of discrimination. Plaintiff is a member of a protected class: she is a woman. She

was qualified for the branch manager position. Indeed, she performed satisfactorily in that role for 16-plus years prior to her termination. Plaintiff clearly suffered an adverse employment action – she was fired. Finally, she was replaced by someone outside of her protected class, a male branch manager. This is sufficient to establish a prima facie case of gender discrimination.

### ii. Legitimate Non-Discriminatory Reason

The burden then shifts to Defendant to present a legitimate non-discriminatory reason for Plaintiff's termination. I find that Defendant has done so. Defendant's stated reason for terminating Plaintiff's employment was for creating a hostile work environment in violation of the Harassment Free Workplace policy (Dkt. 16, Ex. 18, Case #557018-0; Ex. 1, Moskalenko Dec, ¶23). Plaintiff, as a branch manager, was the highest ranking on-site supervisor at the branch. Management of subordinate employees was, unquestionably, one of her key job functions. It is well-established that poor performance is a legitimate, non-discriminatory and non-retaliatory reason for terminating an employee's employment. *See Stockman v. Oakcrest Dental Ctr., P.C.*, 480 F.3d 791, 802 (6th Cir. 2007).

### iii. Pretext

The burden then shifts back to Plaintiff, who must show that a reasonable jury could find that Defendant's articulated reason is pretext for unlawful gender discrimination. A plaintiff may show this in three ways: that the proffered reasons: (1) "had no basis in fact;" (2) "did not actually motivate the employer's action;" or (3) "were insufficient to motivate the employer's action." *Chen v. Dow Chemical Co.*, 580 F.3d 394, 400 (6th Cir. 2009).

Under the first approach, a Court should grant summary judgment to the defendant when the plaintiff "'only create[s] a weak issue of fact as to whether the defendant's reason [is] untrue' and there is ample evidence to support the employer's position." *Abdulnour v. Campbell Soup Supply Co.*, 502 F.3d 496, 504 (6th Cir. 2007). Under the second approach to showing pretext, the plaintiff must demonstrate that a reasonable jury could find that "the sheer weight of the circumstantial evidence of discrimination makes it more likely than not that the employer's explanation is a pretext, or coverup," and did not actually motivate its action. *Macy v. Hopkins Cty. Sch. Bd. of Educ.*, 484 F.3d 357, 368 (6th Cir. 2007). Under the third approach to showing pretext, Plaintiff must show by a

preponderance of the evidence that "other employees, particularly employees not in the protected class, were not fired even though they were engaged in substantially identical conduct to that which the employer contends motivated its discharge of [Plaintiff]." *Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 286–87 (6th Cir. 2012) (internal quotation omitted).

After reviewing the evidence in the record, I find that a reasonable factfinder could doubt that Plaintiff was fired solely for performance-related reasons. Put differently, there are genuine issues of material fact in this record as to whether Defendant's stated reasons for terminating Plaintiff's employment were pretextual, that can only be resolved by a jury. The key evidence showing this issue of fact is the deposition of Marla Zwiesele, one of Plaintiff's employees at the 12 mile/Dequindre branch. Ms. Zwiesele testified that Smigiel approached her shortly prior to Plaintiff's termination and asked her for a statement about Plaintiff (Dkt. 23, Ex. 9, Zwiesele Dep. at 7). Zwiesele further testified that Plaintiff's disciplinary actions towards "Jessica" and "AJ" (the two employees complaining about Plaintiff's behavior) were appropriate, and not overly harsh. Zwiesele also stated that profanity was used in the branch, in-

cluding by Plaintiff's male replacement, Chris Starling. Zwiesele's testimony, combined with Plaintiff's own testimony rebutting many of Defendant's proffered reasons for firing her, raises a triable question as to whether Plaintiff's gender was in fact a motivating factor in Defendant's decision to terminate her employment. Furthermore, Plaintiff has presented evidence that Smigiel terminated female branch managers at a much higher rate than their male counterparts. This evidence must be viewed in a light most favorable to Plaintiff. After taking such a view, the record before the Court contains issues of material fact that can only be decided by a jury. Defendant's motion for summary judgment on Plaintiff's gender discrimination claims is thus denied.

### C. Age Discrimination

Plaintiff also brings claims of age discrimination under the ADEA and Michigan's ELCRA. The manner of adjudication is similar under both statutes: unlawful discrimination may be shown by way of direct or circumstantial evidence, the latter of which is typically analyzed under the *McDonnell-Douglas* burden-shifting framework. *See Tilley v. Kala-*

*mazoo Cnty. Road Comm'n*, 777 F.3d 303, 307–308 (6th Cir. 2015). Plaintiff does not purport to offer direct evidence of age discrimination, but rather, again presents her case using the *McDonnell-Douglas* scheme.

The ADEA makes it unlawful for an employer "to fail or refuse to hire or to discharge ... or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, *because of* such individual's age." 29 U.S.C. § 623(a)(1)(emphasis added). To prevail on a claim under the ADEA, it is not sufficient for the plaintiff to show that age was a motivating factor in the adverse action; rather, the "because of" language in the ADEA requires that a plaintiff "prove by a preponderance of the evidence (which may be direct or circumstantial) that age was the 'but-for' cause of the challenged employer decision." *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177–78, 129 S.Ct. 2343, 174 L.Ed.2d 119 (2009). For an employer to take an adverse action "because of age" means "'that age was the 'reason' that the employer decided to act.'" *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 133 S.Ct. 2517, 2527, 186 L.Ed.2d 503 (2013) (quoting *Gross*, 557 U.S. at 176, 129 S.Ct. 2343) (extending *Gross* to retaliation claims under

Title VII); *Scheick v. Tecumseh Pub. Sch.*, 766 F.3d 523, 529 (6th Cir. 2014).

This record contains less evidence of age discrimination than it does concerning gender discrimination. The chart presented by Plaintiff, listing the terminated branch managers (Dkt. 23, Ex. 16), shows a rather even distribution of ages among the involuntarily terminated branch managers. Indeed, all other fired branch managers were *younger* than Plaintiff (ages 37, 38, 42, 43, 47, 52, 55). Contrary to Plaintiff's suggestion, this data is not suggestive of a trend to fire older employees. Furthermore, as noted above, the ADEA requires a higher standard of causation ("but for") than Plaintiff's gender discrimination claim ("motivating factor").[3] Also, Plaintiff was not replaced by a younger branch manager. Plaintiff's replacement, Mr. Starling, was exactly the same age as Plaintiff when she was terminated – 55 years old.[4] Particularly where

[3] In contrast to the ADEA's "but-for" causation burden, under the ELCRA a plaintiff must ultimately prove that the defendant's age-related discriminatory animus was a "substantial" or "motivating" factor in the decision. *Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 818 (6th Cir. 2011) quoting *Sniecinski v. Blue Cross & Blue Shield of Mich.*, 469 Mich. 124, 666 N.W.2d 186, 192–93 (2003). This divergence, however, is ultimately irrelevant, because Plaintiff cannot satisfy either of these burdens for her age discrimination claims.

[4] The plaintiff could not establish a prima facie case of age discrimination where "in the absence of direct evidence that the employer considered age to be significant, an

there were ample performance-based reasons that could justify Plaintiff's termination, this evidence in the record is not sufficient to raise a genuine issue of material fact that Plaintiff's age was the but-for reason for her firing. As such, Defendant is entitled to summary judgment on these claims.

### D.    Retaliation Claims

Plaintiff also brings claims for retaliation under both the ADEA and ELCRA. The *McDonnell-Douglas* framework also governs claims of retaliation based on circumstantial evidence. To establish a prima facie case of retaliation, a plaintiff must show "(1) that the plaintiff engaged in a protected activity; (2) that the defendant had knowledge of the plaintiff's protected conduct; (3) that the defendant took an adverse employment action towards the plaintiff; and (4) that there was a causal connection between the protected activity and the adverse employment action." *Weigel v. Baptist Hosp. of E. Tenn.*, 302 F.3d 367, 381 (6th Cir. 2002). "Specifically, 'but for' causation between the protected activity and the adverse employment action is needed." *Beard v. AAA of Mich.*, 593 Fed.

---

age difference of six years or less between an employee and a replacement..." was present *Grosjean v. First Energy Corp.*, 349 F.3d 332, 340 (6th Cir. 2003).

App'x. 447, 451 (6th Cir. 2014) (citing *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2533 (2013)). A retaliation claim based on ELCRA "requires showing that the plaintiff's protected activity was a 'significant factor' in the employer's adverse action[.]" *Mickey v. Zeidler Tool and Die Co.*, 516 F.3d 516, 527 (6th Cir. 2008). "The burden of proof at the prima facie stage is minimal; all the plaintiff must do is put forth some credible evidence that enables the court to deduce that there is a causal connection between the retaliatory action and the protected activity." *Dixon v. Gonzales*, 481 F.3d 324, 333 (6th Cir. 2007). After considering the evidence presented, the Court finds that Plaintiff has not established a prima facie case of unlawful retaliation.

Plaintiff's retaliation claim centers on her contention that she called Employee Relations and complained that Mr. Foster received the Rochester/Wabash branch manager position over her because he was younger. But, records created at the time of her call reveal that Plaintiff expressed only that she should have received the transfer because it was closer to her home and because she had been at the bank longer than Mr. Foster. The contemporaneous records do not reflect that Plaintiff mentioned age discrimination as a factor in her not getting her preferred

transfer (Dkt. 16, Ex. 16, Case #526557-0; Ex. 14, 2014 Review). As such, the record does not support a conclusion that Plaintiff engaged in any protected activity.

To satisfy the second prong, Plaintiff must show that the official committing the adverse action knew of the plaintiff's exercise of protected activity. *See Fenton v. HiSAN, Inc.*, 174 F.3d 827, 832 (6th Cir. 1999). Defendant argues that Plaintiff has not produced sufficient evidence showing that the decision makers involved in her termination knew of her alleged complaints and that they involved protected activity. The Court agrees. Plaintiff has not presented evidence that the individuals involved in the termination decision had any knowledge that she allegedly complained of age discrimination before they made the decision to terminate her employment (Dkt. 16, Ex. 1, Moskalenko Dec, ¶25; Ex. 21, Ex. 7, Smigiel at 52-54; Ex. 21, Smigiel Dec, ¶8). Because Plaintiff has not presented any competent evidence that they knew of the alleged complaint, she cannot establish a causal link.

Finally, the Court notes that there was at least a nine-month gap between Plaintiff's alleged discrimination complaint and her termination. Such a considerable length of time between the alleged protected

activity and Plaintiff's termination is too great to support an inference of causality between her alleged complaint and her termination. Where an adverse employment action "occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation." *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008). "But where some time elapses between when the employer learns of a protected activity and the subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality." *Id.* Plaintiff has not done so, and that is fatal to her retaliation claims. For example, in *Cooper v. City of N. Olmsted*, 795 F.2d 1265, 1272 (6th Cir. 1986), the Sixth Circuit found that the mere fact that the plaintiff was discharged four months after filing a discrimination claim was insufficient to support an inference of retaliation without any other evidence of causation.

In sum, Plaintiff has not demonstrated that there is a genuine issue of material fact regarding her retaliation claims, and thus Defendant is entitled to summary judgment on these claims.

## E. Disability Discrimination

Finally, Plaintiff brings claims of disability discrimination under the ADA and under Michigan's PWDCRA. Plaintiff claims that her impairment is back and leg pain (Dkt. 16, Ex. 2, Plaintiff Dep. at 103-104). She alleges that her back/leg occasionally goes "numb" and that it happens infrequently. *Id.* Plaintiff stated, however, in her EEOC Charge Intake Questionnaire that she is not disabled and testified at her deposition that she is able to do normal daily functions, including the ability to walk, sit, and stand (Dkt. 16, Ex. 20, EEOC Charge; Ex. 2, Plaintiff Dep. at 104-105). The only thing Plaintiff claimed she could not do was lift heavy objects (Dkt. 16, Ex. 2, Plaintiff Dep. at 105).

The Sixth Circuit has held that a plaintiff's "bare assertions" regarding a health condition, "without any supporting medical evidence, cannot establish a 'physical or mental impairment' within the meaning of the ADA." *Neely v. Benchmark Family Services*, 640 Fed. App'x 429, 433 (6th Cir. Jan. 26, 2016). A "[plaintiff]'s self-described symptoms to his physician, without corroborating medical evidence of any diagnosis are insufficient to establish a substantial limitation on any major life ac-

tivity." *Neely*, 640 Fed. App'x at 435. Indeed, "[a]n impairment is a disability…[only] if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population." 29 C.F.R. § 1630.2. Where, as here, Plaintiff has not proffered any medical documentation to substantiate that her claimed disability substantially limited her in her ability to work "compared to most people in the general population," or to otherwise perform a major life activity, she cannot establish she was disabled.

Furthermore, Plaintiff has also failed to present sufficient evidence that any of the decision makers were aware of her alleged disability at the time of the termination decision (Dkt. 16, Ex. 1, Moskalenko Dec, ¶24; Ex. 21, Smigiel's Dec, ¶7). Plaintiff contends that, three days prior to her termination, she faxed Smigiel and Smigiel's assistant, requesting to leave work early for the next 4 weeks on Tuesdays and Thursdays, as Plaintiff required physical therapy treatment for her back condition (Dkt. 23, Ex. 10, p. 93). While Smigiel may have been aware that Plaintiff had requested to leave work early to attend physical therapy, Plaintiff has failed to demonstrate that such knowledge is akin to knowing that Plaintiff suffers from a disability.

Defendant is entitled to summary judgment on Plaintiff's disability discrimination claims.

## CONCLUSION

For the reasons set forth above, Defendant's motion for summary judgment (Dkt. 16) is **GRANTED IN PART** and **DENIED IN PART**. Defendant is entitled to summary judgment on Plaintiff's ADEA and ELCRA age discrimination claims and retaliation claims (Counts III, IV, VI) and on Plaintiff's ADA claim (Count V), and these claims are dismissed with prejudice. Defendant is not entitled to summary judgment on Plaintiff's gender discrimination claim (Count I). Thus, Count I shall proceed to trial.

**SO ORDERED**.

BY THE COURT:

s/Terrence G. Berg
TERRENCE G. BERG
UNITED STATES DISTRICT JUDGE

Dated: November 26, 2018

## Certificate of Service

I hereby certify that this Order was electronically submitted on November 26, 2018, using the CM/ECF system, which will send notification to each party.

s/A. Chubb
Case Manager